# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **NOEL AUSTIN** | **CIVIL ACTION** |
| **VERSUS** | **NO. 07-9362** |
| **N. BURL CAIN, WARDEN** | **SECTION "K" (6)** |

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.

Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2). Accordingly, it is recommended that the petition be **DENIED WITH PREJUDICE.**

# I.  PROCEDURAL HISTORY[1]

On October 9, 2003, the Jefferson Parish District Attorney filed an eight-count bill of information against petitioner, Noel J. Austin, charging him with six counts of attempted first degree murder of police officers in violation of La.R.S. 14:27 and 14:30 (counts one through six), one count of possession of more than 400 grams of cocaine in violation of La.R.S. 40:967(F) (count seven), and possession with intent to distribute cocaine in violation of La.R.S. 40:967(A) (count eight).[2]  At arraignment petitioner pleaded not guilty.  On November 13, 2003, the trial court denied petitioner's motions to suppress the evidence and to reveal the identity of the informant.

On February 18, 2004, petitioner, tried in the Twenty-Fourth Judicial District Court for the Parish of Jefferson before a twelve-member jury, was found guilty as charged on counts one, two, and eight; not guilty on counts three, four, and six; and guilty of the responsive verdict of aggravated battery on count five.

On March 4, 2004, the trial court denied petitioner's motion for a new trial and sentenced him to serve fifty years of imprisonment at hard labor for the attempted first degree murder convictions, without benefit of parole, probation, and suspension of sentence, ten years of imprisonment at hard labor for the aggravated battery conviction, and thirty years

---

[1]A portion of the procedural history was taken from the Louisiana Fifth Circuit Court of Appeal's opinion, *State v. Austin,* 900 So.2d 867 (La. App. 5 Cir. 2005).

[2]The State later dismissed count seven.

of imprisonment at hard labor for the conviction of possession with intent to distribute cocaine. The trial court denied petitioner's motion to reconsider his sentences and granted his motion for an appeal.

That same day, the State filed a habitual offender bill of information against petitioner based on prior convictions of distribution of cocaine in 1991 and attempted murder in 1995, allegations that petitioner denied. After a habitual offender hearing on May 18, 2004, the trial court found petitioner to be a third felony offender, vacated his original sentence on count one, and imposed a sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

On March 1, 2005, the Louisiana Fifth Circuit Court of Appeal affirmed petitioner's convictions and sentences. *State v. Austin*, 900 So.2d 867 (La. App. 5 Cir. 2005). Less than a year later, on November 28, 2005, the Louisiana Supreme Court denied petitioner's writ application, thereby rendering his convictions and sentences final. *State v. Austin*, 916 So.2d 143 (La. 2005).

Following the completion of his direct appeal proceedings, petitioner sought state post-conviction relief. Petitioner's efforts in this regard culminated on September 14, 2007, when the Louisiana Supreme Court denied his writ application. *State ex rel. Austin v. State*, 963 So.2d 389 (La. 2007).

On October 15, 2007, petitioner filed the instant petition for writ of habeas

corpus, raising the following claims: 1) He was denied protection against double jeopardy; 2) he was denied effective assistance of counsel; 3) he was denied a fair trial by virtue of the trial court's failure to make an inquiry regarding and/or declare a mistrial as a result of mid-trial prejudicial publicity; and, 4) the trial court erred in denying his motion to reveal the identity of the confidential informant. The State, in its response, concedes that the instant action is timely and that petitioner has exhausted his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982).[3] Accordingly, this court shall review the pertinent facts and standard of review, then proceed to address the merits of petitioner's claims.

## II. FACTS[4]

At trial, Louisiana State Police (LSP) Trooper Warren Ayo testified that he is assigned to the Gulf Coast HIDO (High Intensity Drug-trafficking Officers), a task force that works in conjunction with the federal Drug Enforcement Administration (DEA). With the assistance of a confidential informant and undercover DEA Agent Carlton Simmons, HIDO formulated a plan to arrange a purchase of one kilogram of cocaine from Noel Austin for $21,500 on the evening of April 11, 2003. The transaction was planned to take place at Chevy's Restaurant on Manhattan Boulevard in Harvey, Jefferson Parish.

---

[3]*See* Federal rec., doc. # 9, p. 4.

[4]The facts are taken from the state appellate court's opinion on direct appeal, *State v. Austin*, 900 So.2d 867 (La. App. 5 Cir. 2005).

Several members of the Jefferson Parish Sheriff's Office (JPSO) assisted the LSP in the operation, including Detectives Danny Jewell and Eric Davis, who were together in one vehicle, and Detectives Michael Pizzolato and Brandon Boilan, who were together in another vehicle. The officers were positioned behind Chevy's, in the parking lot of the Palace Theatre, and observed petitioner arrive alone in a red Yukon.

Detectives Jewell and Pizzolato testified that petitioner parked his vehicle and went into Chevy's. Petitioner returned to his vehicle, but went back and forth between his vehicle and Chevy's several more times. At some point, petitioner was on foot in the parking lot and met with an individual in another car. (This individual was later identified as petitioner's brother, Stokely Austin.)

Detective Boilan, using high-powered binoculars, observed petitioner receive something from the individual in the car (Stokely Austin). Petitioner returned to the Yukon and drove to the north side of Chevy's parking lot, where he parked. Detective Boilan observed a black male (the confidential informant) approach the Yukon and speak with petitioner. However, no objects were exchanged between the two men. Detective Boilan testified that, after the black male (confidential informant) walked to the rear of the Yukon, Trooper Ayo signaled for all the officers to move in and "take down" (arrest) petitioner.

Prior to the takedown order, however, Agent Simmons and the confidential informant had met with petitioner inside the restaurant. Agent Simmons testified about the

events inside the restaurant leading up to the takedown order. According to Agent Simmons, petitioner wanted to count the money in the restaurant. Agent Simmons testified that he showed the money to petitioner, who seemed satisfied. Petitioner went outside, made a telephone call, and returned inside the restaurant. Then, Agent Simmons, the confidential informant, and petitioner walked outside. Agent Simmons went to his undercover vehicle, while the informant walked over to petitioner's vehicle. The informant approached Agent Simmons' vehicle and told Agent Simmons that petitioner had the cocaine. After Agent Simmons communicated this information to the other officers, Trooper Ayo gave the takedown order to move in and arrest petitioner.

Upon receiving the takedown order, Troopers Bergeron and Baron moved in and parked their undercover vehicle at an angle behind petitioner's Yukon. Detective Jewell ran from his undercover vehicle and positioned himself on the median in front of the Yukon, facing the passenger's side headlight. Troopers Bergeron and Baron got out of their vehicle and stood behind the Yukon.

All the officers repeatedly ordered petitioner to stop and surrender, but instead petitioner backed out of his parking space. According to Troopers Bergeron and Baron, petitioner backed toward them, but they moved out of the way. The Yukon ultimately collided with the undercover vehicle. Trooper Derrick Stewart, who was on foot in the parking lot, testified that he fired at the Yukon when it narrowly missed Trooper Bergeron.

At that point, Detectives Jewell, Pizzolato and Boilan were on foot in front of the Yukon, wearing marked police clothing. They too repeatedly ordered petitioner to stop. However, petitioner placed the vehicle in gear and accelerated forward. All three officers fired their weapons at petitioner: Detective Boilan, who had moved away from Detectives Jewell and Pizzolato and was in the clear, fired in defense of the two detectives, while Detectives Jewell and Pizzolato fired in defense of their own lives.

Detective Pizzolato testified that he moved out of the way. Detective Jewell testified that he was watching petitioner through the window and saw him violently jerk the wheel and turn his body, causing the Yukon to swerve to the right. The Yukon missed Detective Jewell by approximately eighteen inches. As Detective Jewell followed alongside the Yukon, he heard the vehicle's RPMs increase. He fired another shot into the Yukon to divert petitioner from "going at" Detective Davis.

Detective Davis testified that the Yukon proceeded straight, but then accelerated toward him. Detective Davis did not discharge his weapon at the Yukon, and he was able to move to safety. The Yukon then passed through an outlet in Chevy's parking lot, ran over the median, and crashed into a light pole in the Palace Theatre's parking lot. Detective Boilan was beside the vehicle after it crashed. He heard a loud explosion, which he thought was gunfire, and fired into the driver's side window of the Yukon. The officers subsequently determined, however, that petitioner was unarmed.

Petitioner was shot during the gunfire. When the paramedics arrived, they cut open petitioner's pants leg, at which time a kilogram of cocaine fell to the ground. JPSO Lieutenant Bruce Harrison, the State's narcotics expert, testified that the cocaine was packaged in a manner consistent with distribution, not for personal use, and that it had a street value of between $100,000 and $200,000.

At trial, Detective Boilan explained that the type of investigation they generally conduct is termed a "rip," which means that the drug transaction is not actually completed. Rather, the officers arrest the suspect after the drugs are delivered and he is in possession of the drugs.

In addition to the trial testimony, the State introduced a diagram of the parking lot, which was used by the witnesses to illustrate the evening's events. Petitioner did not call any witnesses, but introduced two diagrams that also were used by some of the witnesses during their testimony.

## III. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and

fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).

*Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## IV.  ANALYSIS

### A.  Violation of Protection Afforded Under the Double Jeopardy Clause

The Double Jeopardy Clause provides three related protections:  "It protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.   And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969).   The protection of the Double Jeopardy Clause is afforded only when the accused has actually been twice placed in jeopardy.   "[J]eopardy attaches when a jury is empaneled and sworn, or in a bench trial, when the judge begins to receive evidence." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 579, 97 S.Ct. 1349, 1354, 51 L.Ed.2d 642 (1977) (citations omitted).  Where there is no threat of "either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended." *United States v. Wilson*, 420 U.S. 332, 344, 95 S.Ct. 1013, 1022, 43 L.Ed.2d 232 (1975).

Petitioner claims that his protection against multiple punishments for the same offense was violated by virtue of his simultaneous prosecution on the charge of attempted first degree murder of a police officer and on the charge of possession with the intent to distribute cocaine.   According to petitioner, the narcotics charge is an element of the

attempted murder charge and, therefore, he should not have been tried for both offenses.

The Louisiana Fifth Circuit Court of Appeal addressed the instant issue in connection with petitioner's direct appeal. The state appellate court began its analysis by setting forth applicable state law, which mirrors applicable federal law, regarding a defendant's protection against double jeopardy.

> Double jeopardy provisions protect an accused not only from a second prosecution for the same offense, but also multiple punishments for the same criminal act. *State v. Barton,* 02-163, p. 17 (La. App. 5 Cir. 9/30/03), 857 So.2d 1189, 1201, *writ denied,* 03-3012 (La.2/20/04), 866 So.2d 817. When proof of a felony is an essential element of an attempted first degree murder, double jeopardy precludes conviction and punishment of the defendant for both attempted murder and the underlying felony. *See, State v. Pittman,* 95-382, p. 32 (La. App. 5 Cir. 10/1/96), 683 So.2d 748, 765. However, an accused who commits separate and distinct offenses during the same criminal episode or transaction may be prosecuted and convicted for each offense without violating the principle of double jeopardy. *State v. Jackson,* 99-1256, p. 8 (La. App. 5 Cir. 7/25/00), 767 So.2d 848, 853, *writ denied,* 00-2528 (La.10/5/01), 798 So.2d 960.

*Austin*, 900 So.2d at 884.

Next, the state appellate court reviewed the pertinent facts surrounding petitioner's convictions.

> The bill of information charged the defendant with six counts of attempted first degree murder of police officers, and one count of possession of cocaine with intent to distribute. The State did not specify the subsection of La.R.S. 14:30 with which it intended to proceed in the bill of information, and the trial judge charged the jury on subsections La.R.S. 14:30(A)(2), (3), and (6). These subsections define first degree murder as follows in pertinent

part:

(2) When the offender has a specific intent to kill or to inflict great bodily harm upon a fireman, peace officer, or civilian employee of the Louisiana State Police Crime Laboratory or any other forensic laboratory engaged in the performance of his lawful duties, or when the specific intent to kill or to inflict great bodily harm is directly related to the victim's status as a fireman, peace officer, or civilian employee.

(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.

\* \* \*

(6) When the offender has the specific intent to kill or to inflict great bodily harm while engaged in the distribution, exchange, sale, or purchase, or any attempt thereof, of a controlled dangerous substance listed in Schedules I, II, III, IV, or V of the Uniform Controlled Dangerous Substances Law.

*Austin*, 900 So.2d at 884.

Thereafter, the Louisiana Fifth Circuit reasoned:

The jury was not polled on the particular subsection it used to convict the defendant of attempted first degree murder. However, the attempted murder convictions can be upheld if there is sufficient evidence based on any of the alternative theories with which the jury was charged. *See, State v. Brown,* 96-1002 at p. 4, 694 So.2d at 437.

In this case, the evidence was sufficient to prove that the defendant committed attempted first degree murder by specifically intending to kill police officers under La.R.S. 14:30(A)(2).

Because the State proved the attempted first degree murder convictions under La.R.S. 14:30(A)(2) as specific intent crimes, proof of possession of cocaine with intent to distribute was not an essential element. Accordingly, convictions for both crimes do not violate the prohibitions against double jeopardy.

*Austin*, 900 So.2d at 884-885 (footnote omitted).

12

This court finds that the above reasoning does not represent an unreasonable application of Supreme Court law to the facts of the instant case. Accordingly, petitioner's claim for habeas corpus relief based upon an alleged violation of his protection against double jeopardy is without merit.

## B. Denial of Effective Assistance of Counsel

The seminal Supreme Court decision regarding ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), wherein the Court held that in order to prove that counsel was unconstitutionally ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the *Strickland* test, "it is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), *citing Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. To prove prejudice under the *Strickland* standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner claims that defense counsel was ineffective due to his admission, during his opening statement, that his client would not be mounting a defense to the narcotics charge. Specifically, counsel stated:

> For the first time, I think, in my career, we're not mounting a defense on the drugs. There is no defense. I'm not going to stand up here and tell you that they didn't find the drugs. They did find the drugs. I'm not going to tell you they didn't find it where they found it because I'm not going to insult your intelligence with that. But the evidence is going to show that my client did not, absolutely did not, intend, did not actively desire to hurt anyone, much less murder six police officers.

State rec., vol. 2 of 4, p. 258, lines 25-32; p. 259, lines 1-6.

According to petitioner, counsel should have mounted a defense to the narcotics charge and should not have informed the jury that he was not mounting a defense to that charge. However, petitioner does not argue what defense should have been mounted.

A review of the state court record reveals that petitioner raised the instant claim in connection with his post-conviction proceeding. The state district court, in addressing the claim, first reviewed the applicable two-part *Strickland* test. Applying that test to the pertinent facts, the court concluded that petitioner failed to satisfy his burden of proof since counsel's action fell within the ambit of trial strategy.[5]

The court finds that the state court's finding in this regard does not represent an

---

[5]A copy of the state district court's post-conviction opinion is contained in the State rec., vol. 3 of 4.

unreasonable application of Supreme Court law to the facts of this case. Defense counsel, by virtue of the testimony taken in connection with his unsuccessful motion to suppress the narcotics seized from his client, was aware of the substantial evidence against petitioner in connection with the narcotics charge. Trooper Ayo provided undisputed testimony to the effect that a kilo of cocaine was discovered hidden in one of petitioner's pants legs.[6] The relatively weak evidence associated with the attempted murder charges, i.e., the fact that petitioner allegedly tried to run over the police officers with his car, rather than pulling a knife or gun on them, as compared with the strong evidence associated with the narcotics charge, clearly reflects counsel's strategy in making the opening statement which he made. Further, the court notes that counsel's strategy in this regard, to a certain extent, was successful in that the jury found petitioner not guilty in connection with two of the six attempted murder counts for which he was tried, and found him guilty of the lesser offense of aggravated battery with respect to a third attempted murder count.[7] Accordingly, petitioner's ineffective assistance of counsel claim is without merit.

### C. Denied Fair Trial Due to Mid-Trial Prejudicial Publicity

Petitioner argues that the trial court's action or, more accurately, inaction, as a result of a prejudicial article printed in the New Orleans metro area newspaper, The Times-

---

[6]*See* State rec., vol. 1 of 4, p. 84, lines 25-31.

[7]*See* discussion *supra* at p. 2.

Picayune, during his trial, resulted in a violation of his constitutional rights. The pertinent

facts, as set forth in the state appellate court's opinion, are as follows:

> On the second day of trial, the *Times-Picayune* newspaper published an article that referred to the defendant's 1995 conviction for a "similar charge." The article, which the defendant supplied to the trial judge, asserted that the defendant had received an eight-year sentence for "setting up an ambush of three Jefferson Parish sheriff's deputies, targeting one of them because the officer disrupted his narcotics sales.... Fifteen gunmen were said to open fire on the deputies in an open field in Harvey, but none was hit." The article went on to discuss the charges that were the subject of the current trial.

> The defendant moved for the trial judge to ask the jurors whether they had read the article and to grant a mistrial if the jurors had read the article. In denying both motions, the judge stated that he had admonished the jury not to read the newspaper.[8] The judge pointed out there was no evidence to suggest that any of the jurors had disobeyed his admonition. The judge further stated that he was concerned the defendant would be prejudiced by an inquiry into whether or not the jury had read the article, because it would make the jurors aware that the defendant's situation was so "grave that they're doing articles about it during the course of the trial and might actually have the opposite effect of increasing prejudice...."

*Austin*, 900 So.2d at 882 (footnoted added).

The Fourteenth Amendment guarantees a state criminal defendant the Sixth

Amendment right to a jury trial. *See Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444,

---

[8]The Louisiana Fifth Circuit specifically noted:
> [T]he record reflects the trial judge instructed the jury at the outset of trial to decide all questions based on the evidence. After the first day, the judge admonished the jurors not to allow any outside factors to "pollute" their thought processes, such as "anything" they might hear on the radio or see in the newspaper or television. In addition, when the judge gave the final jury instructions, he told the jurors to render a verdict on the evidence, not on public opinion.

*Austin*, 900 So.2d at 883.

1447, 20 L.Ed.2d 491 (1968). This constitutional right encompasses the right to a fair trial by an impartial jury. *See, e.g., Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Further, it is well-established that a state prisoner's claim that he was denied the right to a fair trial by an impartial jury may be considered by a federal court on habeas corpus review. *Id.* There is, however, a significant distinction between the standard of review applied when a federal court is considering a claim raised by a state prisoner contending he was denied the right to a fair trial by an impartial jury and the standard of review applied when considering the same claim raised by a federal prisoner. *See Gall v. Parker*, 231 F.3d 256, 308 (6th Cir. 2000) (standard required when habeas petitioner is attacking a state court conviction is more demanding than when habeas petitioner is attacking a federal conviction). This distinction is exemplified by the Supreme Court decisions in *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) and *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

In *Marshall*, *supra,* jurors in a federal criminal action were exposed to prejudicial publicity concerning the defendant. The Court determined that such exposure warranted the granting of a new trial, expressly stating that its decision was based upon its "exercise of our supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts...." *Marshall*, 360 U.S. at 313, 79 S.Ct. at 1173.

In *Murphy*, *supra*, jurors in a state criminal action were similarly exposed to

prejudicial publicity concerning the defendant. The Court, however, determined that such exposure did not deprive petitioner of an impartial jury, recognizing that it was not bound by its decision in *Marshall* since the *Marshall* Court had reversed the conviction "expressly '(i)n the exercise of (its) supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts,' and not as a matter of constitutional compulsion." *Murphy*, 421 U.S. at 797, 95 S.Ct. at 2035. The Court reasoned: "In the face of so clear a statement, it cannot be maintained that *Marshall* was a constitutional ruling now applicable, through the Fourteenth Amendment, to the States." *Murphy*, 421 U.S. at 798, 95 S.Ct. at 2035.

In the instant action, petitioner, in support of his claim, cites two cases, *United States v. Aragon*, 962 F.2d 439, 441 (5th Cir. 1992) and *United States v. Herring*, 568 F.2d 1099, 1100 (5th Cir. 1978), wherein the Fifth Circuit determined that the federal trial courts erred when they failed, in response to prejudicial publicity, to question jurors regarding their exposure to this publicity.[9] In both cases, however, the Fifth Circuit reached its decisions via the exercise of its "supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts." As such, these Fifth Circuit decisions do not represent constitutional rulings applicable, through the Fourteenth Amendment, to the States and, more specifically, applicable to the instant state habeas corpus application.

---

[9]*See* Federal rec., doc. 1, p. 16.

In the factually similar case of *Tunstall v. Hopkins,* 126 F.Supp.2d 1196 (N.D. Iowa Dec. 27, 2000), Tunstall, along with two co-defendants, was charged with burglary and murder.  Before the jurors were chosen, the trial court advised the venire panel:

> If you are selected as a juror, it will be your duty not to consider anything outside of the evidence in the case.  For example, you must not make any independent investigation of the facts or independently research the law.  You must not give any consideration to what you may hear about the case in the news media or elsewhere.  Your decision must be based solely on the evidence presented to you in the trial of the case and the Court's instructions.  That will be your sworn duty if you are selected as a juror....

*Id*. at 1205.

Thereafter, at the conclusion of the first day of testimony, the trial court instructed jurors that it was:

> [C]onceivable that there could be some mention of this case somewhere in the paper or on TV or something like that.  And if there is, remember what I told you about that.  Don't pay any attention to it, whatever you -anyone else might say about this case. You folks know far more about what's happened than anyone else could possible know[.]

*Id.*

On the second day of trial, an article regarding the charges against defendants appeared in the local newspaper.  Defense counsel reported to the trial judge that he had seen a juror reading a copy of the newspaper in the jury room.  Based upon this mid-trial publicity, Tunstall moved for a mistrial, arguing that he was prejudiced by the fact that the news article

inaccurately portrayed him as a pimp, inaccurately stated that he had hit the victim with a piece of furniture, and stated that he and his two co-defendants were cousins. However, it was unclear whether any of the pertinent jurors had actually seen the allegedly prejudicial article since, at the time the article appeared, there were two trials proceeding simultaneously at the county courthouse and defense counsel was unable to state whether the juror reading the paper was one of the jurors from Tunstall's trial. Further, counsel was unable to state whether the juror was reading the edition of the paper that contained the article about Tunstall's trial. The edition of the newspaper that was admitted into evidence at trial was defense counsel's personal copy and not the actual newspaper that he observed in the jury room.

The trial court, without questioning jurors as to whether any of them had, in fact, read the article and been prejudiced by it, denied Tunstall's motion. The trial court's action in this regard was affirmed on direct review by the Iowa Court of Appeal and the Iowa Supreme Court later denied further review.

Following the conclusion of his state proceedings, Tunstall sought federal habeas corpus relief. In his habeas petition, Tunstall set forth a myriad of claims, including that "[t]he trial court erred in failing to voir dire the jury panel to determine whether any of the jurors had read a newspaper article concerning Tunstall's case". *Id.* at 1199.

Tunstall's habeas petition was "referred to United States Magistrate Judge Paul A. Zoss, pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended

disposition of the petition." *Id.* In his Report and Recommendation, Magistrate Judge Zoss recommended that Tunstall's habeas petition be granted, concluding:

> [T]he trial court erred in failing, first, to make a determination of whether the newspaper article was potentially prejudicial to Tunstall; second, if so, to voir dire the jurors to determine if any of them had seen or read the article in question; and third, if so, to ascertain the degree of any prejudice to the defendant arising therefrom and take appropriate action, including declaring a mistrial if appropriate, to protect Tunstall's rights.

*Id.*

United States Chief District Judge Bennett, in performing a *de novo* review of the magistrate judge's Report and Recommendation, first noted that Magistrate Judge Zoss, in arriving at the above conclusion, "relied exclusively on the standards formulated by federal circuit courts reviewing habeas corpus petitions arising from federal convictions." *Id.* at 1206.[10] The district court then reasoned:

> Consequently, these federal courts were not constrained to finding a violation of a constitutional magnitude to grant the petitioner relief; rather, these federal courts, pursuant to its [sic] "supervisory power," were permitted "to formulate and apply proper standards for enforcement of the criminal law in federal court." *See Marshall.* Furthermore, in the wake of *Williams,* this court is prevented from looking to lower federal court decisions in determining whether the state court decision is contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. *See*

---

[10]In a footnote, Chief Judge Bennett cited the numerous federal circuit court cases upon which the magistrate judge relied in reaching his conclusion that Tunstall was entitled to habeas relief. One of these cases was *United States v. Aragon*, *supra*, a case from the United States Fifth Circuit Court of Appeals employing the less stringent standard of review applicable for federal prisoners. Interestingly, petitioner, in the instant action, similarly relies upon *United States v. Aragon* to support his claim that he is entitled to habeas corpus relief. *See* discussion *supra* at p. 18.

*Harris v. Stovall,* 212 F.3d 940, 944 (6th Cir.2000) (explaining that the *Williams* decision prevents the district court from looking to lower federal court decisions in determining whether the state court decision is contrary to, or an unreasonable application of, clearly established federal law).[11] In so doing, this court rejects the standard for reviewing Tunstall's claim formulated by Judge Zoss in the Report and Recommendation.

*Tunstall*, 126 F.Supp.2d at 1206 -1207 (footnoted added).[12]

Employing the proper standard of review, as dictated under *Williams*, *supra*, the district court concluded:

[B]ecause there is no clearly established federal law, as determined by the Supreme Court, that governs Tunstall's claim for habeas corpus relief, this court **sustains** respondents objections to Judge Zoss's Report and Recommendation, and **rejects** Judge Zoss's Report and Recommendation. Accordingly, Tunstall's petition for writ of habeas corpus predicated on this claim is **denied.**

---

[11]*See supra* at pp. 8-10 for full discussion on the proper standard of habeas corpus review as dictated by *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), along with *Bell v. Cone*, 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

[12]Chief Judge Bennett, in dictum, provided:

The court, however, would not hesitate to grant Tunstall relief under its supervisory power to formulate standards for the enforcement of the federal criminal law in federal court had Tunstall been convicted in federal court and had this habeas corpus action been brought pursuant to 28 U.S.C. § 2255 instead of 28 U.S.C. § 2254. Indeed, the court would accept and adopt the standard articulated by Judge Zoss in the Report and Recommendation. However, the court is not presented with a 28 U.S.C. § 2255 action; rather it is presented with a 28 U.S.C. § 2254 action and, therefore, the court must find a violation of a constitutional magnitude in order grant Tunstall relief, notwithstanding this court's disapproval of the trial court's inaction.

*Tunstall*, 126 F.Supp.2d at 1207.

*Tunstall*, 126 F.Supp.2d at 1207 (emphasis original).

In the instant action, as in *Tunstall*, the trial court instructed jurors to base their decision only on the evidence introduced at trial and not to consider any outside matters they may read or hear in the news.  Further, in the instant action, unlike in *Tunstall*, there was, as the trial court noted, not even a "scintilla of evidence" that the jurors in petitioner's case violated the trial court's instruction.[13]

Based upon the above two critical factors, the trial court denied petitioner's request to make an inquiry of the jury with regard to the newspaper article and denied petitioner's motion for a mistrial.  Under these circumstances, the trial court opined that making such an inquiry could actually increase the likelihood of prejudice by possibly leading jurors to attribute greater significance to the seriousness of the case or the alleged dangerousness of the defendant by virtue of the attendant publicity.[14]

This court finds that there is no clearly established federal law, as determined by the Supreme Court, reflecting that the trial court's decision in this regard was unconstitutional.  Accordingly, the instant claim for federal habeas corpus relief is without

---

[13] *See* State rec., vol. 2 of 4, p. 415, lines 1-12.  *See also Jones v. United States,* 527 U.S. 373, 393, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (jurors are presumed to have followed the district court's instructions) (citations omitted); *Delli Paoli v. United States,* 352 U.S. 232, 242, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957) ("Our jury system is based upon the assumption that juries will endeavor to follow the Court's instructions.").

[14] *See* State rec., vol. 2 of 4, p. 415, lines 13-27.

merit.

### D.  Denial of Motion to Reveal Identity of Confidential Informant

Petitioner argues that his constitutional rights were violated when the trial court denied his motion to disclose the identity of the confidential informant whose actions, along with actions on the part of sheriff officials, led to petitioner's arrest and ultimate conviction. For the following reasons, petitioner's argument is without merit.

The seminal Supreme Court case regarding the privilege against disclosure of an informant's identity, recognized by the Louisiana Fifth Circuit in addressing the instant issue on direct appeal, *see Austin*, 900 S.Ct. at 880, is *Roviaro v. U.S.*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).  In *Roviaro*, the Supreme Court explained:

> What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.  The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement.  The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

*Id.*, 353 U.S. at 59, 77 S.Ct. at 627.

Thereafter, the *Roviaro* Court described the application of the privilege as a balancing procedure where the public interest in protecting the informant's identity is weighed against the defendant's need for the information in order to present his defense.  The

more vital the informant's role in bringing about the defendant's arrest, the greater the limitation which is placed on the informant's privilege.

In an effort to illustrate the above balancing process, the Court provided an example of the type of situation where the privilege is generally determined to give way to the defendant's need for the information.

> Most of the federal cases involving this limitation on the scope of the informer's privilege have arisen where the legality of a search without a warrant is in issue and the communications of an informer are claimed to establish probable cause. In these cases the Government has been required to disclose the identity of the informant unless there was sufficient evidence apart from his confidential communication.

*Roviaro*, 353 U.S. at 61, 77 S.Ct. at 628.

Applying the balancing procedure described in *Roviaro* to the facts of the instant case, the Louisiana Fifth Circuit Court of Appeal reasoned:

> In the present case, while the defendant asserts that the confidential informant was the only person who saw the cocaine before it was recovered by police, he does not specify how the confidential informant's testimony might have helped in his defense. The defendant does not argue that he was framed by the informant, or that the informant placed the cocaine in his automobile. Considering the facts that the police observed the defendant receive a package from Stokely Austin, the informant did not exchange anything with the defendant, and the cocaine was discovered in the defendant's pants during medical treatment, we cannot envision any testimony the confidential informant could have provided that would warrant revealing his identity.

*Austin*, 900 So.2d at 881.

Based upon the above reasoning, the state appellate court concluded that petitioner's need to know the identity of the confidential informant "did not outweigh the public interest in protecting the informant's identity." *Id*. at 881-882. Thus, the state Fifth Circuit determined that the trial court did not err in denying petitioner's motion to reveal the identity of the confidential informant.

This court finds that the above conclusion on the part of the Louisiana Fifth Circuit Court of Appeal does not represent an unreasonable application of Supreme Court law to the facts of this case. As such, petitioner's claim for habeas corpus relief is without merit.

Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the application for federal habeas corpus relief filed on behalf of petitioner, Noel Austin, be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass'n*,

79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this __16th__ day of _____October_____, 2009.


LOUIS MOORE, JR.

United States Magistrate Judge